4 F.3d 982
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
JOSE FRANCISCO RIVERA-LOPEZ, Plaintiff, Appellant,
v.
UNITED STATES of America, Defendant, Appellee.
 No. 92-2322.
 United States Court of Appeals,
First Circuit.
 September 15, 1993
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO
 Jose Francisco Rivera-Lopez on brief pro se.
 Daniel F. Lopez-Romo, United States Attorney, and Charles E. Fitzwilliam, Executive Assistant United States Attorney, on brief for appellee.
 D.Puerto Rico.
 AFFIRMED.
 Before Selya, Cyr and Boudin, Circuit Judges.
 Per Curiam.
 
 
 1
 In 1987, petitioner Jose Rivera Lopez (Rivera) pled guilty to procuring by fire the destruction of the DuPont Plaza Hotel in Puerto Rico. In 1991, he moved to vacate his sentence under 28 U.S.C. Sec. 2255, alleging that he had received ineffective assistance of counsel, that his guilty plea was involuntary and unknowing, that newly discovered evidence exonerated him, and that there was substantial disparity between the sentences given him and his co-defendant. The district court denied his motion without an evidentiary hearing, and Rivera appealed. We affirm.
 
 I. Background
 
 2
 On December 31, 1986, the DuPont Plaza Hotel in San Juan, Puerto Rico burned, killing 97 people. At the time, hotel management was engaged in difficult collective bargaining negotiations with the Teamsters Union. Within weeks of the fire, the government had obtained the confessions of two hotel employees. Hector Escudero Aponte (Escudero) admitted that he had set the fire, and Armando Jimenez Rivera (Jimenez) admitted that he had provided Escudero with the sterno used in starting the fire. Escudero told the government that Rivera, a fellow employee, had suggested setting a fire that day to pressure management to give in to union demands. Other witnesses told investigators that Rivera had made statements before the fire broke out which suggested that there should or could be a fire at the hotel that day, or that he had urged hotel employees to make a "curtain" to shield Escudero from view as he lit the sterno. Escudero, Jimenez and Rivera were indicted for their roles in the fire. The indictment against Rivera stated that Rivera had "knowingly and intentionally procure[d] the ... malicious damaging and destruction, by means of fire, of a building ... which fire resulted in the death of persons, all in violation of [18 U.S.C. Secs. 2 and 844(i) ]."
 
 
 3
 Eventually, all three defendants pled guilty. Rivera admitted that he had urged Escudero to set the fire and had made statements to the effect that a fire should be set, but did not admit any involvement in shielding Escudero from view as he lit the sterno. In its plea agreements with Rivera and Jimenez, the government agreed to recommend sentences of 25 and 24 years, respectively. At the plea hearing, the government made the promised recommendations, but the court (Fuste, J.) sentenced Rivera to 99 years in prison and Jimenez to 75 years. We upheld the sentences upon appeal. United States v. Jimenez-Rivera, 842 F.2d 545 (1st Cir.), cert. denied, 487 U.S. 1223 (1988). In 1990, Judge Fuste reduced Rivera's sentence to 40 years, and Jimenez's to 25 years. Rivera then brought the present motion to vacate his sentence. On appeal, he claims that his motion alleged sufficient facts to require an evidentiary hearing on his claims; he also alleges that the district court erred in dismissing his sentence disparity claim.
 
 II. Discussion
 A. Ineffective Assistance of Counsel
 
 4
 Rivera makes numerous allegations in his briefs, and in a separate affidavit submitted in support of his claim, that his court-appointed counsel, Frank Inserni, Esquire, rendered ineffective assistance.[1] The gist of Rivera's claim is that Inserni failed to interview favorable witnesses and to investigate his defenses adequately.
 
 
 5
 To state a sufficient claim of ineffective assistance, Rivera must show that Inserni's performance fell below an objective standard of reasonableness and that Inserni's inadequate performance prejudiced him-that there is a "reasonable probability" that, but for Inserni's errors, Rivera would not have pled guilty, but would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 58-59 (1985). To show that he was prejudiced by Inserni's failure to investigate defenses or to discover potentially favorable evidence, Rivera must demonstrate that any such defenses or evidence likely would have changed either Inserni's recommendation that Rivera plead guilty, or the outcome of a trial. Id. at 59. Moreover, Rivera stated under oath at his Rule 11 hearing that he was satisfied with Inserni's representation. As these sworn statements are presumptively true, Rivera must give a credible reason for his retraction. See Hernandez-Hernandez v. United States, 904 F.2d 758, 762 (1st Cir. 1990); United States v. Butt, 731 F.2d 75, 80 (1st Cir. 1984).
 
 
 6
 Rivera claims that Inserni did not conduct an adequate investigation of a list of witnesses Rivera gave him when Inserni was appointed. Rivera says those witnesses could have refuted the testimony of government witnesses as to his involvement in the so-called "curtain" episode, his actual statements upon arriving at the hotel after a union meeting at a local restaurant, and his whereabouts or other details concerning his actions on the day of the fire. Rivera also says that Inserni did not interview witnesses who might have helped determine whether Rivera had induced Escudero to start the fire. He suggests that union members who attended the meeting at a local restaurant on the day of the fire, and a delegate named Muniz who travelled with Escudero and Rivera to the meeting, could have shed light on that issue.
 
 
 7
 Rivera states that Francisco Velez Muniz and Emilio Lanzo Santiago would have "controverted" the statements he allegedly made in the hotel kitchen before and after the union meeting. However, Velez's statement, submitted with the habeas petition, says that Velez saw Rivera at the hotel, the day of the fire, pounding his fist on a table and declaring "[t]oday there is going to be blood and fire in the Hotel, we are going to burn everything that we find in our way." Lanzo's statement described three men who left the hotel's south ballroom together shortly before Lanzo discovered the fire in the south ballroom. According to other documents in the record, Lanzo's descriptions fit Escudero, Rivera and Jimenez.
 
 
 8
 With respect to the list of other potential witnesses, Rivera says only that those witnesses would have refuted the testimony of government witnesses on certain issues, e.g., the "curtain" episode and Rivera's statements upon arriving at the hotel. He neither states what their testimony would have been, nor that they would be willing to testify; he presented no affidavits from these "witnesses." Thus, the district court was justified in not holding an evidentiary hearing. See Lincecum v. Collins, 958 F.2d 1271, 1280 (5th Cir.) (no evidentiary hearing required where habeas petitioner said that friends and relatives would have testified as to allegedly mitigating circumstances-which petitioner did not otherwise describe-where none of alleged witnesses had submitted an affidavit showing that his or her testimony would have helped petitioner), cert. denied, 113 S. Ct. 417 (1992); United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989) (similar). We note also that the suggested testimony apparently would not have challenged the admissions by Escudero, the government's chief witness. As the government agreed to recommend a 25-year sentence instead of life,[2] we decline to speculate that either Inserni's recommendation or Rivera's decision to plead guilty (or the outcome of a trial) would have been different, given Escudero's admissions, let alone Rivera's pre-plea admissions.
 
 
 9
 Finally, no evidentiary hearing was required on the claim that Inserni should have interviewed union members who attended the union meeting at a local restaurant with Rivera and Escudero the day of the fire. Rivera says that the union members could have helped determine whether Rivera had induced Escudero to start the fire. The record suggests that Muniz may have suggested to Escudero that he set a fire among the boxes in the south ballroom and that previously Muniz had instructed Escudero to set other fires at the hotel which had caused minor property damage. However, the discovery that Muniz or others had instructed Escudero to start other fires, or instructed Escudero to start this fire, would not have relieved Rivera of aider and abettor liability for having himself affirmatively encouraged Escudero to start the fire several hours before. See, e.g., Pearson v. United States, 192 F.2d 681 (6th Cir. 1951) ("one who with knowledge of the commission of a crime assists in its execution may not escape the penalty merely because another is the dominating or controlling actor"); see Asher v. United States, 394 F.2d 424, 430-31 (9th Cir. 1968) (similar); United States v. Garguilo, 310 F.2d 249, 253 (2d Cir. 1962) (similar). Thus, Inserni's failure to interview these witnesses would not have provided Rivera with a viable defense to "aiding and abetting." See United States v. Porter, 924 F.2d 395, 397 (1st Cir. 1991) (no "prejudice" absent showing that failure to investigate or interview witnesses deprived defendant of "viable defense") (direct appeal).
 
 
 10
 Nor does Rivera suggest a sound basis for discrediting his sworn statement at his plea hearing that he was satisfied with Inserni's representation. Rivera appears to have known what Inserni's investigative efforts were before the hearing. Thus, this is not a case where lack of knowledge explains why a statement made under oath should now be discredited. Compare United States v. Giardino, 797 F.2d 30, 32 (1st Cir. 1986) (petitioner's stated satisfaction with counsel's performance preceded petitioner's knowledge of counsel's misrepresentations).[3]
 
 B. The Guilty Plea
 
 11
 Rivera claims that his plea was not voluntary and knowing. Inserni allegedly did not explain the charges adequately, pressured him, misrepresented the facts, and caused him to plead guilty despite his innocence. Finally, Rivera alleges, the sentencing judge became involved in the plea bargaining process. Rivera's allegations are conclusively refuted by the record. Moreover, assuming their truth, his specific allegations would provide no basis for relief, hence no evidentiary hearing was required. See Lema v. United States, 987 F.2d 48, 51-52 (1st Cir. 1993).
 
 1. Failure to Explain Charges
 
 12
 Rivera's affidavit attests that Inserni never explained the charges, the "technicalities" of the case, the elements of his offense or how they applied to his case. His brief says that Inserni never explained the aiding and abetting charge. Rivera concedes that Inserni explained the "fire count" to him. Furthermore, when Rivera initially appeared before a magistrate on January 30, 1987, he was given a copy of the indictment charging that he knowingly and intentionally procured the malicious destruction of property by fire. In his plea petition, Rivera acknowledged his understanding of the charges; that among the acts that made him think he was guilty was his "instigation" of Escudero to set the fire; and that Inserni had explained the language in the indictment and the elements of the offense. At the Rule 11 hearing, Rivera stated under oath that he had had ample opportunity to discuss the case with Inserni; he knew what the indictment said; he knew he was being charged with "procuring" the fire; he understood the charge; and he agreed with the government's summary of the evidence against him, referencing his comments to Escudero that a fire had to be set to pressure management.[4] Thus, the record conclusively shows that Rivera knew and understood the charge against him.
 
 2. Counsel's Alleged Coercion
 
 13
 Rivera charges that Inserni coerced his plea despite his protestations of innocence. Rivera's affidavit states that Inserni told him that, if he rejected the government's offer, murder charges would be filed in relation to a federal officer who died in the fire; that the government had threatened to seek the death penalty if he did not plead guilty; and that, immediately before the plea hearing, Inserni reminded him that the government would file murder charges that day if Rivera did not plead guilty. Consequently, he alleges, during the plea hearing he was afraid, nervous and unable to understand what was said.
 
 
 14
 Rivera does not allege that the government would have had no basis for filing a murder charge against him. Indeed, Rivera pled guilty to second degree murder in a Commonwealth court. In the federal case, Escudero pled guilty to causing the federal officer's death. Thus, the threat, even if made, was not improper. See Bordenkircher v. Hayes, 434 U.S. 357, 362-65 (1978) (prosecutor may threaten more serious charges if defendant does not plead guilty, provided the evidence would support charges). The record refutes Rivera's contentions.
 
 
 15
 The record shows that Rivera was aware at the time he pled guilty that the government had announced that it would not seek the death penalty. In connection with his change of plea, Rivera initialed each page of a change-of-plea petition, apparently prepared by Inserni, which specifically stated in a handwritten entry that the maximum punishment was life imprisonment ("cadena perpetua"). The first handwritten entry had been crossed out, however, and the only legible letters ("de") suggest that Inserni first began to write "death" but then wrote "life imprisonment."[5] At the plea hearing, the court basically adopted the government's position, indicating that it would not impose the death penalty. Under oath at the hearing, moreover, Rivera acknowledged that he knew that the government was not seeking the death penalty, and also told the court that no one had threatened him or coerced him into pleading guilty.[6]
 
 
 16
 Although Rivera now claims that he was too nervous and confused to understand what was happening at the plea hearing and that Inserni told him what answers to give, later events belie his claim, including the fact that two months later, at sentencing, Rivera made an impassioned statement of remorse, which left little doubt that he still believed himself guilty as stated under oath at the plea hearing. Moreover, Rivera made no subsequent attempt (apart from the present) to inform the court of Inserni's alleged lies and coercion, nor did he seek new counsel in his later efforts to reduce his sentence. Rather, Inserni brought Rivera's direct appeal of his sentence in 1987, his Rule 35(b) motion to reduce sentence in 1989, and his motion for reconsideration, which ultimately led to the sentence reduction. In the years following his plea and sentencing, Rivera's letters to Inserni do not question Inserni's representation until late 1989, and even then had nothing to do with any alleged coercion or lies by Inserni.
 
 
 17
 As Rivera suggests no credible basis for disbelieving his sworn statements at the plea hearing, no evidentiary hearing was required. See Ouellette v. United States, 862 F.2d 371, 375-76 (1st Cir. 1988) (no evidentiary hearing required on claim that counsel's misrepresentation caused defendant to plead, guilty where, despite many chances to bring alleged misrepresentations to court's attention, petitioner did not try to do so until his Sec. 2255 motion almost two and one-half years after sentencing; "failure ... to voice to the court any concern about the course of events is directly at odds with [petitioner's] contention that the record does not contradict his position"); United States v. Cermark, 622 F.2d 1049, 1051-52 (1st Cir. 1980) (similar).
 
 
 18
 3. Judicial Participation in Plea Bargaining
 
 
 19
 At the plea hearing, Rivera indicated under oath that he had not been threatened or induced (except as stated in the plea agreement) to plead guilty and that he understood that the government's 25-year recommendation did not bind the court. In the plea agreement, signed before the court indicated that it would not impose the death penalty, Rivera acknowledged that the court could impose any sentence authorized by law.[7] Likewise, in his plea petition, Rivera acknowledged that the court could impose the same punishment on him as if convicted by a jury, that sentencing was solely for the court, and that the court had not suggested what the actual sentence would be.
 
 
 20
 Rivera now claims that Inserni told him that Judge Fuste would not accept a guilty plea unless Rivera submitted a "confession" accepting "some guilt." In his brief, Rivera appears to argue that the judge actually was involved in the plea bargaining process, and not that Inserni had misrepresented the situation to him.[8] Ultimately, this allegation depends on a slip of the tongue at the outset of the plea hearing, when the judge adverted to Rivera's plea petition as "a confession, which you subscribed under oath." When Inserni reminded the court that the plea petition was not under oath, Judge Fuste immediately stated that what he had before him was Rivera's plea petition.
 
 
 21
 We confess confusion concerning Rivera's allegations. Rule 11 mandates that the court, before accepting a guilty plea, inquire into the nature of the government's proof, the defendant's understanding and voluntariness, and the existence of a factual basis for the plea. See Fed. R. Crim. P. 11(c),(d),(f). Thus, we attribute Rivera's allegations to misunderstanding. See, e.g., Rodriguez v. United States, 964 F.2d 840, 841 (8th Cir. 1992) (judge's exploration of factual basis for plea in bench conference with counsel at plea hearing was not intervention in plea negotiations); Fama v. United States, 901 F.2d 1175, 1178 (2d Cir. 1990) (court's rejection of first plea agreement, based on concerns about voluntariness and factual basis for plea, not impermissible participation in plea negotiations).
 
 
 22
 Beyond this, Rivera's allegations are vague, conclusory and speculative. He neither alleges nor otherwise substantiates that he was promised a 25-year sentence if he pled guilty, though he seems to imply as much; he does not claim that, absent court pressure, Inserni would not have recommended the plea; nor does he say he was told to admit guilt or suffer specific untoward consequences, or that he believed the court was threatening adverse consequences unless he pled guilty. Thus, his allegations did not raise a factual issue as to whether the judge took part in plea negotiations.[9]
 
 
 23
 Finally, Rivera's suggestion that the court urged his guilty plea in exchange for a 25-year sentence is refuted by Rivera's later conduct. Had he believed that the court was behind the government's 25-year recommendation, he would have known on June 22, 1987, when he was sentenced to 99 years, that the judge had reneged. Yet neither on direct appeal nor later did Rivera raise the judicial intervention claim, nor does he now claim that he wanted to do so but was prevented by counsel or circumstances.
 
 C. Newly Discovered Evidence
 
 24
 In 1988 and 1989, Escudero testified at a preliminary hearing, and in a Commonwealth bench trial, against union members charged with arson and murder in connection with the hotel fire. The trial judge acquitted the defendants, perhaps because he did not credit Escudero's testimony. During the course of the proceedings, Escudero allegedly testified that he had lied "many" times to federal officials investigating the fire; that he had not planned, agreed to or discussed starting a fire at the hotel with Rivera "with the intention of destroying the hotel" while travelling with Rivera to the hotel (though he acknowledged that Rivera had said something to a security guard at the hotel about "wreck[ing]" or "everybody's going to get screwed here"); Rivera had encouraged others to "make a curtain" around Escudero when he set the fire so that he would not be seen; and other union members had induced Escudero to start the fire. Rivera argues that Inserni would have discovered this evidence had he interviewed Escudero, and would not have advised a plea.[10]
 
 
 25
 We are unpersuaded. First, in the form presented to us, the transcripts, apparently comprising hundreds of pages in their entirety, consist of selected snippets of Escudero's testimony. Moreover, although some consecutive pages of testimony are provided, others are isolated and clearly exclude material required for a full understanding of the testimony in context. In other instances, no clear meaning can be gleaned in translation.[11]
 
 
 26
 Second, the proffer of Escudero's testimony does not purport to state that Rivera did not encourage Escudero to start a fire, without Rivera's participation, with the purpose of causing less significant property damage. Nor does it gainsay that Rivera made statements at other times that day, or took other actions, that encouraged Escudero to set the fire. The fact that others initially urged Escudero to set the fire would not relieve Rivera of liability for his own criminal actions.
 
 
 27
 Finally, since Rivera has not demonstrated entitlement to an evidentiary hearing on the claim that his plea was invalid, the later evidence, such as it is, that Escudero minimized Rivera's involvement in the fire, is immaterial in view of the district court's valid determination that Rivera's plea was supported by the government's evidence. See United States v. Kearney, 682 F.2d 214, 221-22 (D.C. Cir. 1982) (Sec. 2255 motion, based on ground that key testimony was coerced and perjured, was denied where other unchallenged evidence conclusively established guilt).
 
 D. Sentencing Disparity
 
 28
 Finally, we reject the claim that Rivera, allegedly less culpable than Jimenez, should not have received a longer term of imprisonment. This claim unsuccessfully attempts to resurrect issues previously addressed on direct appeal. See Jimenez-Rivera, 842 F.2d at 548-50.
 
 
 29
 Affirmed.
 
 
 
 [1]
 The allegations in Rivera's brief are far more specific than those made under oath in his affidavit. Ordinarily, assertions made in briefs are insufficient to raise a cognizable issue of fact. Because of Rivera's pro se status, however, we have considered the allegations in his brief as well. See United States v. Michaud, 925 F.2d 37, 41 (1st Cir. 1991)
 
 
 [2]
 18 U.S.C. Sec. 844(i) authorizes a maximum penalty of death or life imprisonment. However, before plea negotiations began, the government announced that it would not seek the death penalty. Thus, at the time the government agreed to recommend a 25-year sentence, its maximum alternative recommendation under the statute would have been life imprisonment
 
 
 [3]
 Rivera claims that Inserni never investigated his personal background (e.g., education, social background, marital status, etc.) so as to mount an effective defense. Such information is most relevant at sentencing. See Thomas v. Kemp, 796 F.2d 1322, 1323 (11th Cir.), cert. denied, 479 U.S. 996 (1986). Rivera makes no showing that the presentence report did not fully present this information to the sentencing judge
 
 
 [4]
 At the Rule 11 hearing, Judge Fuste read the charge and paraphrased or read the language of both 18 U.S.C. Secs. 2 and 844(i); he also verified that, in light of the charge of procuring and the harsh sentence which could be imposed under the statute, Rivera still wanted to plead guilty. After Rivera responded affirmatively, Judge Fuste asked: "So, I gather, then, that you understand the charge; do you have any doubts?" To this, Rivera responded: "Yes, sir. No, sir." This clearly was meant to convey that Rivera understood the charge and had no doubts about pleading guilty
 
 
 [5]
 Since the court had the plea petition before it when the hearing began, we assume that it had been filled out and signed previously. (We note, however, that the hearing began at 9 a.m., whereas the petition was stamped as filed at 1:10 p.m.). The record contains no evidence that the court had informed the parties before the plea hearing that it would not impose the death penalty. Thus, although correctly reflecting the parties' position, the statement in the plea petition that life imprisonment would be the maximum penalty would appear to have been overstated since the court had not yet acceded. See 18 U.S.C. Sec. 34
 
 
 [6]
 Rivera alleges that his counsel in the Commonwealth case vehemently opposed Inserni's urgings that Rivera plead guilty, thereby attempting, apparently, to support his claim that Inserni had coerced him to plead guilty. Rivera submitted no affidavit from local counsel, nor does he explain its absence. Moreover, Rivera pled guilty to the Commonwealth charges
 
 
 [7]
 Even assuming, as his affidavit states, that Rivera did not see the plea agreement until just before the plea hearing, the judge emphasized orally to Rivera that the government's recommendation was not binding on the court
 
 
 [8]
 Prefatory remarks in Rivera's brief, however, state that Inserni pressured him to plead guilty, requiring "confessions admitting to some guilt based on supposed requests from the Court,...." (Emphasis added.) In arguing the issue, Rivera seems to settle on a claim that the court pressed Inserni to urge Rivera to plead guilty, and that is the argument we address here
 
 
 [9]
 Furthermore, letters he wrote to Inserni after sentencing suggest that Rivera's recollection concerning plea negotiations is less than reliable and that he is confusing the court with the United States Attorney. In a letter to Inserni a year after he was sentenced, Rivera wrote: "You know very well that when Lopez Romo [U.S. Attorney] spoke to you in order to get a plea bargain, I madea statement which you took and the U.S. Attorney didn't accept, and it was when I asked you what you had to say. And you answered me you must accept the facts for him to accept it and in this way reach a plea agreement." Subsequent letters by Rivera refer to Judge Fuste rather than U.S. Attorney Lopez Romo as the one who would not accept Rivera's first "confession." In 1989, Rivera wrote: "I would like you to obtain a copy of my first guilty plea, which I [gave] to you and which Judge Fuste supposedly didn't want to accept as guilty and that was when we had to do another so that he would arrive at the 25-year sentence, which later was not fulfilled...."
 
 
 [10]
 In the district court, Rivera moved for a "new trial" on the basis of newly discovered evidence pursuant to Fed. R. Crim.P. 33 standards. The court noted that Rivera had not had a trial and that his motion was late in any event. Since it found Rivera's claim meritless under Rule 33, the court did not reach the question whether Rivera's claim could be brought as a Sec. 2255 action. See Pelegrina v. United States, 601 F.2d 18, 19 & n.2 (1st Cir. 1979). We need not address the legal issue either, since the claim lacks merit
 
 
 [11]
 Rivera belatedly submitted an uncertified translation of portions of Exhibit 30. Although Rivera did not attach a certificate of service to the translation, the clerk of this court served a copy on the government, and the government has not objected to its inclusion in the record